IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAQUELL HATCHER & NIAMBI COOPER, | : | HON. JEROME B. SIMANDLE |
| | : | Civil No. 08-1444 (JBS/AMD) |
| Plaintiffs, | : | |
| v. | : | **OPINION** |
| FAMILY DOLLAR STORE, INC., | : | |
| Defendant. | : | |

APPEARANCES:

Ari R. Karpf, Esq.
Jeremy M. Cerutti, Esq.
Justin L. Swidler, Esq.
KARPF, KARPF & VIRANT, P.C.
Neshaminy Plaza
3070 Bristol Pike
Building 2, Suite 231
Bensalem, PA 19020
    Counsel for Plaintiffs

Sarah L. Powenski, Esq.
William J. Leahy, Esq.
LITTLER MENDELSON, PC
Three Parkway
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102-3000
    Counsel for Defendant

**SIMANDLE**, District Judge:

**I.   INTRODUCTION**

        This employment discrimination matter is before the Court on Defendant's motion for summary judgment. [Docket Item 14.] For the reasons discussed below, Defendant's motion will be granted in part and denied in part.

## II.   BACKGROUND

Defendant, Family Dollar Store, Inc., operates a retail store in Burlington, New Jersey.  Plaintiff Niambi Cooper was the store manager and Plaintiff Raquell Hatcher served as assistant manager at the Burlington store until they were both terminated on May 19, 2007.  Defendant maintains that Plaintiffs were terminated because they violated a policy that prohibits store managers and assistant managers from permitting non-employees to work in the stores.  Plaintiffs admit to violating the policy, but dispute that this was the true cause of the termination. Plaintiffs, both African-American women, argue that they were actually terminated because of their complaints about the unhealthy conditions at the store in violation of New Jersey's Conscientious Employee Protection Act, N.J. Stat. Ann. 34:19-3. They also maintain that even apart from the allegedly retaliatory aspect of their firing, they were treated differently from white employees who violated the same store policy and were not fired. They therefore bring additional claims for racial discrimination under 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination, N.J. Stat. Ann. 10:5-1.  Ms. Hatcher also brings a claim based on the New Jersey Wage Payment Act, N.J. Stat. Ann. 34:11-4.2, based on a pay increase she was promised and never received.

### A.  Hatcher and Cooper's Employment History and Termination

Ms. Cooper was initially hired at the Willingboro Dollar Store location, in June 2005.  She was promoted to assistant manager and transferred to the newly-opened Burlington store in April 2006, and became store manager in June 2006.  Ms. Hatcher was hired at the Burlington store in January 2007, and promoted to assistant manager in March 2007.

Store managers are supervised by both an Area Operations Manager ("AOM") and a Performance Manager ("PM").  The AOM reports to a Regional Vice President ("VP").  Until August 2006, AOM James Reardon oversaw the Burlington store.  After a reorganization, the AOM was Robert Houser.[1]  Houser and Reardon reported to VP Michael Gray.  The PM for the Burlington store was Matthew Barth.

On March 18, 2007, Ms. Cooper called the fire department after being unable to contact her supervisor because the roof of the store was leaking, there was smoke coming from the electrical units in the building, and the lights were dimming due to electrical problems.[2]  The Burlington store had a partially caved

---

[1]  As discussed below, in May 2007, AOM Houser was terminated, and VP Gray asked Mr. Reardon to cover Mr. Houser's district temporarily.

[2]  Cooper submitted an affidavit stating that she called the fire department because she believed that she should not have been required to work in such conditions.  (Cooper Aff. ¶2.) Defendant argues that this contradicts Cooper's testimony in deposition that "we could smell the smoky smell and the lights were dimming off and on.  And so I called the fire department and they closed the store.  I called the fire department after trying

and leaky roof and related mold build-up and electrical problems.
On top of these issues, the store had persistent sewage problems
involving backed up toilets.  The store was closed by order of
the fire department, who placed a red sign on the building
prohibiting "human occupancy."[3]

     While the store was closed to the public, Plaintiffs were
required to prepare the store for reopening and also help with
Defendant's Willingboro store.  Cooper and her employees stocked
and cleaned the Burlington store amid conditions of visible mold
all over the store and coming out of air vents, horrible odors,
sewage that had backed up from toilets, and did so often without
electricity.  Cooper testified that on one day during the closure
when the smell from the sewage was unbearable, she complained to

---

to reach my district manager, but I did not get an answer."
(Cooper Dep. 74:17-75:6.)  The Court does not find the
contradiction, much less a contradiction so evident that it
warrants exclusion of the affidavit.  Cooper's concern about
smoke and possible fire is perfectly consistent with her belief
that she should not have to work under those conditions.

     [3] Cooper alleges that in the months before the March
closure, she had complained about the various problems to
Defendant's human resources department and maintenance division,
as well as AOM Houser.  However, the only evidentiary support for
the allegation is Cooper's testimony in her deposition that she
once closed the store because of the sewage problems, and that
she told the manager she had closed the store because of the
smell.  (Cooper Dep. 141:12-25.)  Cooper also answered an
interrogatory issued by Defendant stating that "Plaintiff
communicated to Defendant's Human Resources Department, Marjorie
and Mrs. V, Robert Houser, and Matthew Barth. . . . Plaintiff
is unable to remember every single date of communication." (Def.'s
Reply Br. Supp. Summ. J., Ex-1)  However, the answer does not
indicate when these individuals were contacted, and no party
submitted the text of the question to which this answer
responded.

"Miss V" in Defendant's maintenance department, to no avail. (Cooper Dep. 91:25-92:21).[4]  Hatcher also testified in her deposition that she spoke with a "Miss V" in human resources regarding the store conditions.  During the closure, Cooper complained to AOM Houser that she was breaking out in a rash and having other health issues, which she believed to be related to the store's conditions.  Cooper also specifically complained to PM Barth and AOM Houser during this period about the unhealthy conditions of the store.[5]  (Cooper Dep. 175:6-176:4.)  Hatcher also complained to Houser and Barth on multiple occasions about the work conditions, including her rashes and difficulty breathing.

Cooper was ordered to reopen the store on May 3, 2007. Barth told Hatcher and Cooper that his supervisors were tired of the store being closed, and that it must be opened that day. Cooper's affidavit avers that she told Houser that the store

---

[4] Defendant alleges in its briefs that it has no record of a Miss V working for Dollar Store in any department.

[5]  Defendant, in a gambit representative of both sides' tendentious interpretations of deposition answers, tries to distinguish "unsanitary" conditions from unhealthy conditions in an attempt to characterize Cooper's testimony that she complained about "unsanitary" conditions as being insufficient to show that she complained about health hazards.  Even if there were not other clear context for Plaintiff's use of the word unsanitary making it clear that she meant the term to refer to the store being unsafe, (see id. at 174:2-175:25), the ordinary connotation of the word unsanitary is unhygienic or unhealthy.

should not be reopened because she believed the store was in violation of state or local codes.  (Cooper Aff. ¶3.)[6]

At this point, the timeline of events gets somewhat blurrier.  At some point, all are agreed, Hatcher permitted her son, Devante, to unload a truck at the store on two days, for one hour each day.  (Hatcher Dep. 162:9-21.)  It is unclear whether this occurred before or after the reopening.  Hatcher testified that it occurred after the reopening, because the reason they needed an extra set of hands for unloading was that someone had to work the registers.  (Hatcher Dep. 148:2-149:23.)  But Defendants maintain that this occurred during the store closure.  Either some time after Hatcher's son performed this work, or on the second day of the work, Barth and Houser visited the store (the parties dispute whether Hatcher's son was present during the visit).[7]  According to Barth, the visit was to investigate rumors

_____

[6]  Defendant argues that this claim made in Cooper's affidavit contradicts Cooper's deposition testimony.  But Defendant simply mischaracterizes the deposition testimony, which does not contradict the affidavit.

[7]  Oddly, though these parties have extensively disputed every minor discrepancy, and several illusory discrepancies in this case, they do not address an actual and major discrepancy involving the timeline of the off-the-clock work and the visit by Barth and Houser.  Cooper testified that the visit occurred on "the day before" an investigation was initiated on May 9, 2009, (Cooper Dep. 188:15-24.), but also inconsistently states that it occurred while the store was closed (Cooper Dep. 185:5-8.)  Barth was not sure when the visit occurred.  (Barth Dep. 20:23-21:8.)  Houser's testimony indicates that the visit occurred while the store was still closed.  (Houser Dep. 11:2-12:7.)  Defendant's statement of undisputed material facts indicates that the visit was in "late April,"  (Def.'s Statement of Undisputed Material Facts, ¶ 25), and Plaintiffs' opposition does not specifically

that employees were recording work hours that they had not actually been working.  Barth testified that he and Houser were going to check the store's digital video recordings to determine whether employees were in the store during the times that employees had claimed they were working.  (Barth Dep. 19:2-18.) Houser described the visit this way:

> During [the period of the closure] is when we went back in and – I was having an inventory in Willingboro, which is the store right down the street, maybe three miles away, and I asked [Cooper] to come help prep for inventory at the times that she wasn't in the building, her and her assistant at the time, to come help prep for inventory.  She wasn't really showing up for those, so we went to find out why she wasn't showing up.  We went to the store and looked at the video.

(Houser Dep. 11:11-12:8.)  Plaintiffs argue that Barth and Houser's accounts of the reason for the visit are inconsistent, and that in fact the investigation was part of arranging a pretext for firing Plaintiffs.  But both Barth and Houser's accounts are consistent with them going to the store to determine whether Cooper and Hatcher were at the Burlington store during the times they otherwise should have been at the Willingboro store.

The parties also dispute whether Barth and Houser identified Hatcher's son while visiting the store and informed Ms. Hatcher about the violation, or whether it was only upon viewing the video tapes that they discovered him.  Barth testified that he

---

dispute that.  Hatcher testified that her son worked while the store was open, which would mean that according to Barth and Houser, the visit occurred after the reopening.

observed Ms. Hatcher's son and proceeded to ask Houser about him. (Barth Dep. 19:19-20:11.)  Houser ambiguously testified that "We went to the store and looked at the video, the little DVR tapes, and that is when we saw a young boy unloading trucks."  (Houser Dep. 12:7-11.)  Plaintiff implicitly argues that Houser's phrase "that is when" refers to "looked at the video" instead of "went to the store," but the Court cannot determine Houser's meaning either way.  Whether discovered in person or on tape, Houser ultimately reported the fact that Ms. Hatcher's son was working at the store to the Loss Prevention Department.

On May 9, 2007, Loss Prevention Supervisor Bob Petry investigated Houser's report by interviewing Plaintiffs at the store and reviewing the store surveillance tape.  Plaintiffs freely admitted the violation of the nominal store policy.  Plaintiffs allege that they discussed with Petry the health hazards at the store, and their concerns that working in the store despite the fire department's prohibition on "human occupancy" might be illegal.  (Cooper Aff. ¶5; Hatcher Aff. ¶5.)[8]

---

[8]  Defendants argue that the affidavit contradicts Ms. Cooper and Ms. Hatcher's depositions.  In response to the question, "How did your meeting with Mr. Petry end?" Ms. Cooper responded, "Um, it ended with me asking him if I was going to lose my job for it."  (Cooper Dep. 194:19-22.)  Ms. Hatcher testified that she informed Petry about the mold and general mess at the store.  (Hatcher Dep. 157:13-158:12)  The Court fails to see the contradiction between the affidavits and the testimony, much less a contradiction so apparent that it requires the Court to disregard the affidavit.

Defendants deny this.  In his deposition, Petry testified as
follows:

> Q: I am not trying to lock you into a specific time or
> day.  Whether you had a conversation with Mr. Gray the
> same day that you investigated Cooper and Hatcher, the
> following day, or several days later, did you reiterate
> to Mr. Gray everything that you recalled that was
> discussed with you and Cooper and Hatcher?
> A: Yes.
> Q: And did you do the same with Mr. Reardon?
> A: I would say yes.
>
>          . . .
>
> Q: How did you leave it with Mr. Gray, Mr. Houser, or
> Mr. Reardon after you conveyed the information to each
> of them?  Did you just say, "Now it's in your hands.
> Do what you want to do" or did you give some type of
> opinion?
> A:  No.  Just, once again, just the details of the
> case, the investigation, provided it to them and then
> it's up to them to make the decision.

(Petry Dep. 26:23-27:7, 31:24-32:9.)  Plaintiffs heavily rely on

the word "everything" in the question leading to Petry's

unelaborated "yes."  However, in its reply brief, Defendant

submits an affidavit of Mr. Petry's averring that he understood

"everything" to mean everything that was relevant to the

investigation of unauthorized work, and that he never mentioned

anything about store conditions or complaints about store

conditions to Reardon or anyone else.  (Petry Aff. ¶5-6.)  While

Plaintiffs argue that the clarifying affidavit contradicts the

deposition testimony, the Court disagrees.  Given his later

testimony that he provided just the details of the investigation,

the Court finds that the deposition testimony is sufficiently

ambiguous that Petry's declaration should be taken as
uncontroverted.

On May 14, 2007, Houser was terminated for reasons unrelated
to this litigation, and was temporarily replaced by Reardon.
Reardon testified that Barth probably informed him of the policy
violations committed by Cooper and Hatcher on Tuesday, May 15th.
Reardon testified that he made the termination decision.
(Reardon Dep. 16:8-9.)  He could not recall, however, if he was
advised as to whether to terminate Plaintiffs, or take some other
action.  (Reardon Dep. 27:13-24.)   Gray testified that on May
15th he recommended Plaintiffs be terminated, but that it was
left to Reardon's discretion.  (Gray Dep. 24:2-22.)  Barth
testified that the decision was made by Gray, collaborating with
Petry, Reardon, and human resources, but that he personally was
not involved in the discussion about what to do about the policy
violation.  (Barth Dep. 16:24-17:5.)

At 8:47 A.M. on May 18, 2007, Reardon sent Gray and human
resources representative Julie Giblin an e-mail.  The e-mail
stated that Reardon was going to the Burlington store to
terminate Plaintiffs.  Around the same time that the e-mail was
sent, Plaintiffs jointly placed a call to the Health Department
regarding the state of the store, resulting in an immediate
Health Department inspection.[9]

_____

[9]  The health inspector's report indicates that she arrived
at the store at 10:10 A.M.  Cooper testified that the inspector
arrived about an hour after she called.  (Cooper Dep. 150:16-18.)

The next day Barth and Reardon went to the Burlington store
to terminate Plaintiffs.  Reardon asked Cooper to tell Hatcher to
come to the store, because Hatcher was not working that day.
Before Hatcher arrived, Reardon informed Cooper (while Barth was
standing nearby) that she was terminated for the violation of the
non-employee work policy.  Hatcher was subsequently told the same
thing.  Regarding the termination, Hatcher testified as follows:

> Q:  Do you think he was lying when he told you that's why
> you were terminated?
> A:  Yes.
> Q:  Okay.  Why do you think that?
> A:  Because he stated to me, he said, um, Matthew Barth,
> I'm going to have to let you go.  Matthew Barth told me
> that there's some issues, a lot of issues going on around
> here.  And I said, like what?  He said, well, I can't get
> into all of that, but I'm going to have to let you go for
> having, um, [Ms. Hatcher's son] work off the clock.
> Q:  And what did – what did you say in response to that?
> A:  I said – when he stated there were other issues, I
> said, issues like what?  He said that Matthew Barth told
> him it was issues going around – going on in the store.
> And I said, issues like what?  And he said, well, I – I
> can't get into all that, but I am going to have to
> terminate you for having an employee work off the clock.

(Hatcher Dep. 200:23-201:34.)


**B.  Defendant's Enforcement of the Unauthorized Work Policy**

The parties dispute the strictness with which Defendant
enforced the written policy regarding non-employee workers.


Plaintiffs point to two other employees who used non-
employee workers for similar tasks who were not terminated.  Jane
Raymond was the manager at the Willingboro store, who previously

managed Cooper before she was transferred to the Burlington store.  Cooper testified that Raymond had an openly discussed policy of allowing non-employees to unload trucks.  (Cooper Dep. 46:12-47:24.)  Hatcher also testified that Raymond regularly used non-employees for off-the-clock work.  (Hatcher Dep. 164:7-24.)  However, there is no evidence that any of Raymond's supervisors was aware of Raymond's conduct.

Suzanne Wilson was an assistant manager at the Willingboro store.  Cooper and Hatcher both testified that she used non-employees for store work.  (Cooper Dep. 61:2-10; Hatcher Dep. 164:7-24.)  Saniyyah Holt, a Dollar Store employee, testified that Barth had permitted Wilson's husband to work at a Dollar Store without, to her knowledge, taking any disciplinary action (Holt Dep. 79:16-25).[10]  Wilson was ultimately investigated for theft and permitting non-employee work, but resigned before any action was taken.  Ms. Holt testified that she reported Wilson to Defendant's corporate human resources department after Barth ignored her complaints.  (Holt Dep. 45:4-46:24).  Raymond and Wilson are both white.

---

[10]  Holt testified that when Barth was present in the store he acknowledged Wilson's husband and that Barth went into the back of the store where Wilson's husband was helping to unload trucks.  (Holt Dep. 84:4-86:4.)  Although she did not personally see Barth observe Wilson's husband unloading a truck, she testified that under the circumstances there was "no question in her mind" that Barth knew of Wilson's husband working in the back.  (Id. at 79:14-25.)

In addition to the other employees who violated the policy, Plaintiffs point to Cooper's testimony that at manager meetings, led by Mike Gray, she was told that, when needed, she could find someone "off the streets" and pay them petty cash to move boxes, etc. (Cooper Dep. 49:10-50:8.)  She also said Houser had suggested when some carts were missing that she pay somebody to have them go into the neighborhood behind the store to collect the carts.  (Cooper Dep. 50:22-51:6.)  Barth testified that the company has a zero tolerance policy on the issue, (Barth Dep. 37:12-20), but he could not recall a specific instance of someone being terminated based on the policy other than Plaintiffs, and Petry testified that he has investigated three other instances of unauthorized employee work, only one of which he recalled resulted in a termination.  (Petry Dep. 13:10-19:11.)

### C.  Hatcher's Pay Increase

Plaintiff Hatcher argues that she was denied a promised pay increase, in violation of the New Jersey Wage Payment Act, N.J. Stat. Ann. 34:11-4.2 and 4.6, which requires an employer to pay the full amount of wages promised to an employee and to notify the employee of the any pay increases or decreases.

Cooper testified that Barth suggested that she pay her assistant managers $11.00 per hour.  (Cooper Dep. 65:7-19.)  When Hatcher became an assistant manager in March 2007, Cooper submitted a Personnel Action Form indicating that Ms. Hatcher's

pay would be $11.00 per hour.  Cooper told Hatcher that her pay would be increased to $11.00 per hour.  Cooper testified that she had the discretion to set the pay, but that if her superior declined a requested increase, that would be the final call. (Cooper Dep. 223:18-224:15.)  Gray confirmed that store managers have the initial discretion to set pay.  (Gray Dep. 61:23-63:5).

Hatcher's pay did not increase at all from $7.15 per hour until late April or early May, when it increased to $9.00 (instead of the promised $11.00).  Cooper was later told that Houser had vetoed the pay increase because Houser did not think Hatcher was worth $11.00 per hour.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  A fact is "material" only if it might affect the outcome of the suit under

14

the applicable rule of law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

"[T]he nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered."  <u>U.S. v. Premises Known as 717 S. Woodward Street, Allentown, Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

Where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In the event that there is an absence of evidence to prove an essential element of the case "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323.

### B.  CEPA Claim

New Jersey's Conscientious Employee Protection Act ("CEPA") provides "broad protections against employer retaliation for

workers whose whistle-blowing actions benefit the health, safety and welfare of the public." Feldman v. Hunterdon Radiological Associates, 901 A.2d 322 (N.J. 2006) (internal quotations and citations omitted).

CEPA requires a plaintiff to prove four elements for a successful claim: (1) that the plaintiff reasonably believed that the employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 468 (D.N.J. 2009) (citation omitted).

In CEPA cases involving circumstantial evidence of causation, New Jersey courts apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Zaffuto v. Wal-Mart Stores, Inc., 130 Fed. App'x 566, 569 (3d Cir. 2005). Accordingly,

> Once the employee has made a prima facie showing of retaliation, the burden of going forward shifts to the employer who must articulate a legitimate, nonretaliatory reason for the adverse employment decision. If the employer does produce evidence showing a legitimate, nonretaliatory reason for the discharge, the burden of production shifts back to the employee who must show that the employer's proffered explanation is incredible.

Id. (quoting Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1041 (N.J. 2000)).

16

The statute defines the protected activities as being, among other things, when an employee:

> a. discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes . . . (1) is in violation of a law; . . . or c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes (1) is in violation of a law . . . or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. 34:19-3.

Defendant takes no position about which incidents in this case do or do not constitute protected activities. (Def.'s Reply Br., 1). Instead, Defendant argues that none of the potential protected activities is causally related to the termination because they either occurred after the termination decision was made, or were unknown to the decision-maker, Reardon. Defendant also argues that Plaintiffs have not adduced evidence sufficient for a finding of pretext.

## 1. Potential Whistle-Blowing Activities

Although the issue is not disputed, in order to adequately analyze Defendant's arguments on causation the Court must identify the potential protected activities and when they occurred. Plaintiffs have adduced support for some of their allegations of potentially protected activity in their opposition to summary judgment. These include, in rough chronological order: (1) Ms. Cooper's call to AOM Houser indicating that she

had closed the store because of the smell of the sewage; (2) Ms. Cooper's call to the fire department based on the conditions of the store; (3)  Ms. Cooper's complaint to Houser about her health problems related to the store; (4) Ms. Hatcher's complaint to Houser and Barth about her health problems; (5) Cooper and Hatcher's calls to "Miss V." during the store closure; (6) Ms. Cooper's statement to Houser that the store should not be reopened; (7) Hatcher and Cooper's discussion with Petry; and (8) Hatcher and Cooper's calls to the Health Department.

Each of these incidents involves either disclosure to a supervisor or public body of information about the unsanitary or unsafe conditions of the Burlington Store, or objection to those conditions.  The only question would be whether Hatcher and Cooper reasonably believed, in the cases of disclosure, that the conditions complained of violated the law, and in the case of objections, that the conditions either violated the law or were "incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."  N.J. Stat. Ann. 34:19-3.

Viewing the facts in the light most favorable to the non-moving party including the severity of the mold issue, the electrical problems, and the sewage overflow, the Court agrees that with the possible exception of the first incident regarding closure because of the bad smell, each incident satisfies the requirements of N.J. Stat. Ann. 34:19-3 for whistle-blowing

activity.  See, e.g., Hernandez v. Montville Tp. Bd. of Educ.,
808 A.2d 128, 133-34 (N.J. Super. Ct. App. Div. 1992) (finding
that disclosure of school toilets overflowing constituted
whistle-blowing activity).  See generally N.J. Admin. Code § 24
(regulating establishments that sell food items).  The Court need
not decide, at this stage, whether the first store closure
incident constitutes protected activity because it does not
appear to be relevant to Defendant's arguments on summary
judgment.

### 2.  Causal Connection to Termination

In assessing causation, the question before the Court is
whether a reasonable fact-finder, granting to Plaintiff all
favorable reasonable inferences from the evidence, could conclude
that the whistle-blowing activity caused the adverse employment
action.  Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 468
(D.N.J. 2009).  This inquiry typically proceeds by examining
common examples of such evidence, usually including evidence of
temporal proximity, antagonism, and pretext.  But these
enumerated methods of proving causation are but instances of
sufficient evidence, rather than an exhaustive list.  They are
also not discrete, compartmentalized categories that must stand
or fall on their own; instead, the whole may be greater than the
sum of its parts.  See Robinson v. Southeastern Pa. Transp.
Auth., 982 F.2d 892, 895 (3d Cir. 1993) (finding evidence of

causation of an adverse employment action based partly on antagonism and partly on temporal proximity, though temporal proximity alone was insufficient and the antagonistic behavior was not facially related to the protected activity).

Plaintiff argues that the causal connection between the protected activity and the termination is demonstrated by the antagonism toward Plaintiffs, Robinson, 982 F.2d at 895, the temporal proximity between the protected activity and their termination, Cardenas v. Massey, 269 F.3d 251, 264 (3d Cir. 2001), and the weakness of the proffered explanation for termination. Zelinski v. Pennsylvania State Police, 108 Fed. App'x 700, 707 (3d Cir. 2004).

Plaintiffs point to the denial of Hatcher's pay increase as evidence of antagonism, but Hatcher's pay increase was denied by AOM Houser almost immediately after Hatcher was promoted, well before any of Hatcher's protected activity which only occurred after March 18, at the earliest. The other alleged evidence of antagonism is the investigation of the Burlington store based on unsourced "rumors." (Barth Dep. 19:2-18.) This action is not facially antagonistic, like a verbal reprimand for protected activity or a warning against engaging in such activity, but its proximity to protected activity may nevertheless form part of a larger picture of efforts to end Plaintiffs' employment because of the activity. See Robinson, 982 F.2d at 895. It is difficult to determine how compelling the temporal proximity evidence is

20

with respect to the investigation since the parties do not offer consistent positions with regard to when the investigation occurred.

As to the general temporal proximity, other than the health department call, which cannot be causally connected to Plaintiffs' termination because the call was made after Reardon had decided to terminate them, there is obvious temporal proximity between the alleged acts of protected activity and the termination in this case.  Temporal proximity alone can establish causation if it is "unusually suggestive."  Cardenas v. Massey, 269 F.3d 251, 264 (3d Cir. 2001) (internal quotations and citations omitted); see also Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).  What kind of proximity is suggestive enough depends on the context, but it can be as long as months.  See, e.g., Fasold v. Justice, 409 F.3d 178, 189-90 (3rd Cir. 2005); Rogers v. Delaware, Dept. of Public Safety/DMV, 541 F. Supp. 2d 623, 627 (D. Del. 2008).

In this case, each incident occurred within two months of termination, and some within only days.  Defendant does not argue that the temporal proximity in this case is not suggestive.  Defendant instead focuses on whether the termination decision was made with knowledge of the protected activity.  If the decision-makers did not know about the protected activity, the temporal

proximity cannot give rise to an inference that the termination was because of the protected activity.[11]

Plaintiffs argue that a jury could infer that Reardon was aware of the protected activity because he was aware of the store closure. (Reardon Dep. 58:4-59:15). In order for a jury to make this finding, it would have to credit the part of Reardon's testimony acknowledging that the store closed, but not his explicit testimony that he did not know how the store came to be closed, and that he was not even aware of the mold or sewage problems. (Id. at 58:13-21.) Reardon also testified that he did

---

[11]   In addition to this argument about knowledge, Defendant also argues in its reply brief that the intervening discovery of the store policy violation negates any possible connection between the prior protected activity and the termination. The unpublished case Defendant cites, Campbell v. Abercrombie & Fitch, Co., Civ. No. 03-3159, 2005 WL 1387645 (D.N.J. June 09, 2005), is distinguishable from this case. In Campbell, the plaintiff failed to cooperate in the very investigation that his protected activities initiated, undermining the inference of causation based on that protected activity. Additionally, either the policy reason is pretextual or it is not. If it is pretextual, then it should not serve to vitiate an argument about causation based on temporal proximity. If it is not pretextual, then any temporal proximity does not matter because the policy violation is the "legitimate cause," of the adverse action, id. at *8, and Plaintiffs' case would be dismissed. Either way, the inquiry is into whether the policy violation was pretext. If the Court were to allow the existence of any policy violation to negate temporal proximity, without any inquiry into whether the policy violation was the actual basis for the termination, Court would make any inquiry in pretext moot. Just as retaliation cannot be "a license to flaunt company rules or an invitation to dishonest behavior," O'Day v. McDonnell Douglas Helicopter Company, 79 F.3d 756, 764 (9th Cir. 1996), an employee's violation of nominal workplace policies cannot be a license to terminate employees in retaliation for protected activities in circumstances in which non-complaining employees would not have been terminated.

not communicate with Houser about the status of the store after
Reardon took over, and that he did not consult with Houser in any
way about Cooper or Hatcher.  (Reardon Dep. 59:20-60:18.)
However, if the jury did view Reardon's testimony this way, they
could reasonably conclude that the closing of the store on orders
of the Fire Department was an extraordinary enough event that
Reardon would more likely than not, under the circumstances, have
learned the cause of the closing.

Plaintiffs also argue that Reardon may have learned of the
protected activity because he and Barth often communicated about
management of the Burlington store.  Reardon's relationship with
Barth may be an insufficient basis upon which to find that he
conferred with Barth about the protected activity when he
explicitly denied having done so.[12]  However, Plaintiff need not

---

[12]  Whether this circumstantial evidence would be sufficient
on its own presents a close call.  Relationships between middle
managers in a company and the noteworthiness of a particular fact
about an employee are a somewhat thin basis upon which to infer
that a manager was aware of the particular fact about the
employee.  Unfortunately, the question of whether a given
inference may be drawn from a piece of evidence is not especially
amenable to precedential answers.  Though it is ostensibly a
question of law, it is still an almost uniquely context sensitive
question of law.  Additionally, this Court must be especially
careful when considering summary judgment in cases in which
direct evidence of the dispositive facts is within the exclusive
control of the defendant and its agents.  Injustice can result
where a summary judgment movant relies on testimony that, because
of the nature of the facts, is incapable of being effectively
controverted.  10A Charles Alan Wright, Arthur R. Miller, and
Mary Kay Kane, Federal Practice and Procedure, § 2726 (3d ed.
2009) (quoting Bauman, A Rationale for Summary Judgment, 33 Ind.
L.J. 467, 492 (1958)).  It is true that "even where the evidence
is likely to be within the possession of the defendant," the
plaintiff is still required to do more than discredit testimony,

rely solely on the circumstantial evidence to discredit Reardon. Hatcher testified that Reardon admitted to communicating with Barth about "other issues," intimating that they were the real reasons for Plaintiffs' termination.  (Hatcher Dep. 200:23-201:34.)  Under the circumstances, a reasonable jury could determine that those "other issues" refer to Plaintiffs' complaints about the problems at the store.  If the jury were to credit Hatcher's account of the conversation, a reasonable jury could conclude that Reardon had some awareness of Plaintiffs' protected activity.

Additionally, if an ultimate decision-maker is influenced by colleagues with retaliatory animus, his or her decision can be retaliatory even without having the personal knowledge of protected activities necessary to form retaliatory intent.  Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 200 n.11 (3d Cir. 1996).  It is uncontroverted that Gray, at least, recommended termination.  (Gray Dep. 24:2-22.)  The question is whether there

---

and "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  But where there is circumstantial evidence to undermine self-serving testimony about facts within the exclusive knowledge of Defendant, summary judgment can be inappropriate.  Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998).  Even where the circumstantial evidence may not be especially compelling, the presentation of such evidence combined with challenges to the credibility of the movants' witnesses may be enough to satisfy the purposes of summary judgment and permit the facts to be determined by a jury who can fully assess the demeanor and credibility of witnesses.  Fortunately, the Court need not resolve this close issue as Plaintiff has other evidence with which to discredit Reardon's testimony.

is evidence that Gray harbored retaliatory animus.  Gray's recommendation that Plaintiffs be terminated, given the temporal proximity, could give rise to an inference of retaliatory animus for the same reason that a termination itself, if close enough to the protected activity, permits the same inference.

There is no direct evidence that Gray knew of any protected activity.  Unlike in the case of Reardon where there is testimonial evidence indicating he may have known about the protected activity, the evidence with regard to Gray is just that Gray sat at the top of the management structure, and was actively in charge of Plaintiffs' store during the entire relevant period.  However, also unlike Reardon, Gray never denies knowing about the protected activity, because he was never asked.  A reasonable fact-finder could conclude that Gray was aware of at least some of the protected activity, given the circumstances of his position within the organization and the effect of Plaintiffs' complaints (i.e. closure of the store for a significant period).  This reinforces the Court's overall conclusion that, on a totality of the evidence, a reasonable fact-finder could conclude that the termination decision was a result of the protected activity.

The final part of Plaintiffs' evidence on causation involves evidence that Defendant's reason for firing was mere pretext.  In addition to helping to meet Plaintiffs' burden of production on the issue of whether Defendant's explanation for termination is

credible, the existence of doubts about an employer's stated reasons for a termination can support a finding of causation. See Zelinski v. Pennsylvania State Police, 108 Fed. App'x 700, 707 (3d Cir. 2004) ("A plaintiff can also establish the causation element by providing evidence of inconsistent reasons for the adverse employment action.").[13]  If there are reasons to believe that the employer's explanation for an adverse employment action is false, then this evidence suggests that another cause is the real one, and the creation of false pretext suggests the true cause is the protected activity.  To the extent that a jury could find the policy violation to be pretext for the termination, an issue discussed in the next section in the context of the shifting burden of production, this finding would also support Plaintiff's causation claims for the purpose of satisfying Plaintiff's ultimate burden of persuasion.

In summary, Plaintiff has adduced evidence that, if believed, shows that Reardon was aware of some of the temporally proximate protected activity, including those instances of protected activity known to Barth.  Additionally, there is

---

[13]  In this case, Defendant has offered a single reason, not inconsistent reasons, see Hall v. Pennsylvania Dept. of Corrections, No. 3:CV-02-1255., 2006 WL 2772551, at *8 n.7 (M.D. Pa. Sep 25, 2006) (distinguishing Zelinski on this basis), but the thrust of Zelinski and the precedent it cites is merely that among the kinds of circumstantial evidence from which causation can be inferred is the fact that the official reason given for the termination was pretext, as in the case of inconsistent reasons.  See Parker v. Philadelphia Newspapers, Inc., 322 F. Supp. 2d 624, 629 (E.D. Pa. 2004).

evidence that Reardon's decision was influenced by Gray, and therefore by any discriminatory animus Gray may have had based on his likely knowledge about some of the temporally proximate protected activity.  Finally, as discussed in Part III.B.3 below, there is some indication that the stated reason for Plaintiffs' termination was pretext.  Granting to Plaintiff all favorable reasonable inferences from the evidence and assuming that the jury will make credibility determinations in Plaintiff's favor (as the Court must do in a summary judgment motion), the totality of the evidence is sufficient for a reasonable jury to conclude that the whistle-blowing activity caused the adverse employment action.

### 3.  Whether Plaintiffs Adduce Evidence that the Policy Violation was Pretext

Because the Court finds that Plaintiffs have presented a prima facie showing of retaliation, "the burden of going forward shifts to the employer who must articulate a legitimate, nonretaliatory reason for the adverse employment decision." Zaffuto, 130 Fed. App'x at 569.  Here, Defendant identifies the violation of the non-employee work policy as the legitimate, nonretaliatory reason for the termination.  Therefore, "the burden of production shifts back to the employee who must show that the employer's proffered explanation is incredible."  Id.

Plaintiffs have adduced evidence from which a fact-finder could conclude that the stated reason for the termination of Plaintiffs was pretext. This evidence includes Ms. Cooper's testimony that she was directed to hire off-the-clock workers, (Cooper Dep. 49:10-51:6), and Ms. Holt's testimony that Barth was aware of off-the-clock work and did nothing about it. (Holt Dep. 79:16-86:25.)

The only response to this evidence offered by Defendant is unpersuasive. As to Cooper, Defendant claims she acknowledged the enforcement of the policy on non-employee work, but cites a portion of Cooper's testimony stating that she believed non-employee work was authorized under certain circumstances. (Def.'s Response to Pls.' Statement of Material Facts, ¶ 147; Cooper Dep. 191:16-192:20). As to Holt, Defendant claims Holt had no personal knowledge of Barth's observation of Wilson's husband. But although Holt did not see Barth looking at Wilson's husband while he was unloading a truck, she testified based on her personal knowledge to circumstances from which a jury could easily infer Barth's knowledge.[14] Plaintiffs have therefore met their burden of production of evidence from which a reasonable jury could conclude that the employer's proffered explanation is not the real explanation.

---

[14] See note 10 and accompanying text.

C.  **Race Discrimination Claim**

Claims under either § 1981 and NJLAD are also subject to the McDonnell-Douglas burden-shifting framework discussed above. Kant v. Seton Hall University, 289 Fed. App'x 564 (3d Cir. 2008). The elements of a prima facie case of racial discrimination are that (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the position Plaintiff held; (3) Plaintiff suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably OR the circumstances of Plaintiff's termination give rise to an inference of discrimination.  Kimble v. Morgan Properties, 241 Fed. App'x 895, 897-98 (3d Cir. 2007).  The first and third prongs are not in dispute.

Although the parties agree that the NJ LAD claims and the § 1981 claims are substantively identical, they disagree about the meaning of the second and fourth elements.  Defendant maintains that the second element requires Plaintiff to prove that Plaintiffs' "performance met Family Dollar's expectations." (Def.'s Br. Supp. Summ. J., 30.)  There is no reason to quibble over whether this characterization of the required proof is accurate since there is a clear dispute of fact over whether Plaintiffs were expected not to use non-employee workers.  Thus, even if Plaintiff must prove that Plaintiffs' "performance met

29

Family Dollar's expectations," Defendant is not entitled to summary judgment on that point.

Defendant also argues that Wilson and Raymond, the "similarly situated persons" needed to satisfy the fourth element, were not "similarly situated" because Wilson quit before she could be fired for violating the policy, and no manager knew of Raymond's violation of the policy. The Court agrees that in the absence of evidence that anyone above Raymond knew of her regular use of off-the-clock workers, Raymond's continued employment does not help to satisfy the fourth element. But Wilson's conduct is different. Holt testified that Barth did know about Wilson and did nothing. This is evidence of disparate treatment.

Additionally, Plaintiff offers other examples of racially disparate treatment. Hatcher testified that Wilson earned more than her doing the same job with the same amount of experience. (Hatcher Dep., 88:1-90:24.) This is at least facially evidence of "similarly situated persons who are not members of the protected class were treated more favorably." Plaintiffs also point to the termination of Mr. Horton two days subsequent to their own terminations. Horton, who is black, was terminated for being seen consuming a beverage for which he lacked a receipt,

but there are reasons to believe this reason was mere pretext for the termination.[15]

Defendant's only other argument on the race discrimination claim is that Plaintiffs cannot adduce evidence that the stated reason for the firing was mere pretext.  Since the Court already rejected this argument with regard to the CEPA claim, the result is the same in this context.  There is ample evidence from which a fact-finder could determine that the stated reason for the termination of Plaintiffs was pretext.

### D.  Wage Claim

In contrast to the rest of this case, the facts surrounding Ms. Hatcher's wage claim are relatively clear.  Cooper promised Hatcher a wage of $11.00 per hour, pursuant to instructions by Barth.  Houser vetoed this.  The only relevant evidence indicates that Cooper had the discretion to set the pay, but this could be overturned by the AOM.  (Cooper Dep. 223:18-224:15; Gray Dep. 61:23-63:5).

The wage claim therefore involves a simple question of law:

---

[15]  These reasons include the fact that Petry was never contacted about the alleged violation of store policy, and Holt's testimony that someone (whose name she thought was John) who was fired for not having a beverage receipt was really fired for other reasons.  (Holt Dep. 29:8-30:5.)  Defendant simply asserts that Horton's termination is irrelevant to Plaintiffs' case while disputing details without controverting the reasons to believe the stated reason for the termination was pretext.

Can Cooper's promise of a pay increase under these circumstances provide the basis for a wage claim for hours worked as an assistant manager?  Defendant contends that it cannot because Cooper's promise was "unauthorized," but cites no authority for the proposition that a manager's promise of wages must be actually authorized by some higher agent of a corporation to be binding under the Act (as opposed to being apparently authorized from the perspective of the employee), and offers no argument beyond the conclusory statement that it is so.

The Wage Payment Act helpfully provides that "the officers of a corporation and any agents having the management of that corporation shall be deemed to be the employers of the employees of the corporation."  N.J. Stat. Ann. 34:11-4.1(a).  Wages are payments promised by the employer in advance of work performed.  See Finkler v. Elsinore Shore Associates, 725 F. Supp. 828, 832 (D.N.J. 1989).  Therefore Cooper, as store manager, was an agent "having the management of" Dollar Store, and so Cooper's promise to Hatcher was as her employer.  When she promised Hatcher a certain wage as an agent of Defendant, Defendant was obligated to honor that promise when Hatcher began performing the duties of assistant manager in March 2007.  The protection provided by the Act to employees would be significantly lessened if companies that retain veto power over a manager's ability to set a wage can allow an employee to labor under the impression that the manager's promise is valid and subsequently avoid ever having to

pay promised wages for that period by later claiming that any promises were "unauthorized."  Here, it appears that Hatcher was promised the hourly rate of $11.00 as assistant manager, and she performed assistant manager duties for about two months (from March until late April or early May) when Houser determined her rate of pay would be $9.00.  Since it appears to be uncontroverted that Houser had the final say as to Hatcher's rate of pay, her ultimate rate was $9.00 by the time of her termination.  Summary judgment will therefore be granted in part to Defendant on this claim for the period of employment from the date Houser set Hatcher's pay as assistant manager at $9.00.[16]

## IV.  CONCLUSION

Plaintiffs have presented prima facie cases for both CEPA violations and race discrimination.  Plaintiffs have also met the burden of production on the issue of pretext by adducing evidence that the policy that Plaintiffs violated was not the real cause of their termination.  Plaintiff Hatcher's Wage Payment claim will also proceed, for the period of employment as assistant manager until Houser set Hatcher's rate of pay at $9.00, but summary judgment will be entered in Defendant's favor against Plaintiff Hatcher's Wage Act claim for her period of employment

---

[16]  The Court requests that counsel endeavor to stipulate the amount of Hatcher's wage loss at the $11.00 rate from the date she began as assistant manager until the date her final pay rate was set by Houser at $9.00, for purposes of her Wage Payment Act claim.

after her pay rate was set at $9.00.  The accompanying Order will
be entered.


**March 26, 2010**                      **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge